**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**DANIEL E. LUJAN,**

**Plaintiff,**

**v.**

**BOARD OF COUNTY COMMISSIONERS FOR CIBOLA COUNTY, CORECIVIC, INC., CORECIVIC, LLC, AND CORECIVIC OF TENNESSEE, LLC,**

**Defendants.**

**No. 1:25-cv-00527-SMD-JFR**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO REMAND**

Plaintiff's Motion to Remand (Dkt. 14) fails to establish that Defendants' removal pursuant to 28 U.S.C. § 1442(a) was improper. To the contrary, Defendants meet all elements of removal pursuant to the statute, as demonstrated below. Defendants CoreCivic, Inc, CoreCivic, LLC, and CoreCivic of Tennessee, LLC (collectively "CoreCivic") and the Board of County Commissioners for Cibola County ("County") (collectively "Defendants") therefore respectfully request that the Court deny Plaintiff's Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. BACKGROUND

Plaintiff's Motion is based on the erroneous premise that Defendants were state actors with respect to his detention. (Dkt. 14 at 2.) They were not. At all times relevant to the Complaint, Plaintiff Daniel Lujan ("Plaintiff") was a United States Marshals Service ("USMS") detainee (Dkt. 1 at ¶ 5; Dkt. 1-1 at ¶ 15) housed at the Cibola County Correctional Center ("CCCC"), which is owned and operated by CoreCivic pursuant to a "pass-through" Intergovernmental Agreement ("IGA") between USMS and the County (Dkt. 14-3) ("the USMS IGA") and a Management

Agreement between the County and Corrections Corporation of America (Dkt. 14-2) ("the Management Agreement").[1] Plaintiff alleges that he was injured when he and his cellmate, Julian Montoya, also a USMS detainee, were attacked by two other USMS detainees in a segregated housing unit at CCCC on May 27, 2024. (Dkt. 1-1 at ¶ 35–37, 39, 52, 57.) At the relevant time, Plaintiff was not committed to or in the custody of the County, nor was he awaiting trial on a state or local charge.

Plaintiff filed his Complaint in the Thirteenth Judicial District on May 1, 2025, alleging state law claims against CoreCivic and the County arising out of his detention at CCCC.[2] On June 4, 2025, Defendants timely removed the action to this Court pursuant to 28 U.S.C. § 1442(a)(1), asserting that they were acting under a federal officer with respect to Plaintiff's detention at CCCC on behalf of the USMS. (Dkt. 1.) Plaintiff moved to remand on July 22, 2025. (Dkt. 14.)

## II. ARGUMENT

28 U.S.C. § 1442(a) allows "any person acting under [any officer of the United States or any agency thereof, in an official or individual capacity]" to remove "[a] civil action … that is commenced in a State court that that is against or directed to" them "for or relating to any act under color of such office."[3] 28 U.S.C. § 1442(a)(1); *see also Bd. of Cnty. Commissioners of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1250 (10th Cir. 2022). "The statute's basic purpose is to protect against the interference with federal operations that would ensue if a state were able to arrest federal officers and agents acting within the scope of their authority and bring them to trial in a state court for an alleged state-law offense." *Suncor*, 25 F.4th at 1251 (internal citations and quotations omitted).

---

[1] Corrections Corporation of America ("CCA") is now CoreCivic. *See* https://www.corecivic.com/news/corrections-corporation-of-america-rebrands-as-corecivic.

[2] Plaintiff's counsel filed a virtually identical lawsuit on behalf of Plaintiff's cellmate against Defendants in the Thirteenth Judicial District on the same date. Defendants removed that lawsuit to federal court on June 4, 2025. *See* 1:25-cv-00530-GJF-JMR.

[3] (*See also* Dkt. 1 at ¶ 27.)

Section 1442(a) applies to "private persons 'who lawfully assist' federal officers in the performance of [their] official dut[ies]," *id*. (quoting *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)), as well as private corporations, *id.* (citing *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 135–36 (2d. Cir. 2008)). "In either case, private defendants may remove under § 1442(a)(1) if they can show (1) they acted under the direction of a federal officer, (2) the claim has a connection or association with government-directed conduct, and (3) they have a colorable federal defense to the claim or claims." *Id*. (citing cases).

Removal pursuant to § 1442(a) differs from other types of removal in that the general presumption against removal does not apply; rather, § 1442(a) "should be liberally construed to give full effect to [its] purpose." *Id.* (internal citations and quotations omitted); *Willingham v. Morgan*, 395 U.S. 402, 407 (1969) (Th[e] policy [of providing the protection of a federal forum to federal officers] should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)."). Removal pursuant to § 1442(a) further differs from other types of removal in that the removing defendant is not required to obtain the consent of other served defendants. *See Akin v. Ashland Chemical Co.*, 156 F.3d 1030, 1034–35 (10th Cir. 1998) (holding that "G.E. properly removed the case to federal court without the consent of co-defendants" and citing cases from the Second, Fifth, Ninth, and Tenth Circuits in support of the holding). Finally, unlike with other types of removal, an order remanding a case removed pursuant to § 1442 is reviewable by appeal. 28 U.S.C. § 1447(d).

**A. Section 1442(a)(1) Does Not Require a Direct Contractual Relationship.**

Plaintiff baldly contends that "CoreCivic's actions cannot possibly fall under the purview of the Removal Statute, because CoreCivic was not contractually bound to the USMS" (Dkt. 14 at 3), but he has not cited any authority for this proposition. Nor does there appear to be any. Nothing in Section 1442(a)(1) requires a direct contractual relationship between the federal government and a "person" acting under a federal officer. Likewise, nothing in the operative legal standard as

articulated by the Tenth Circuit in *Suncor* requires a direct contractual relationship between a federal officer and a private defendant. 25 F.4th at 1251 ("[P]rivate defendants may remove under § 1442(a)(1) if they can show (1) they acted under the direction of a federal officer, (2) the claim has a connection or association with government-directed conduct, and (3) they have a colorable federal defense to the claim or claims."). While Plaintiff asserts that the Supreme Court's analysis in *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 152 (2007), "suggests federal contractor contractor status as a baseline requirement in the Removal Statute's applicability to private actors" (Dkt. 14 at 5), *Watson* includes no such requirement. Nor does *Watson* conclude that "only private parties directly enlisted by the federal government to perform governmental tasks under contract should qualify for the protections of the Removal statute" as claimed by Plaintiff in his Motion (albeit without any specific citation).

### B. Plaintiff Cites An Inapplicable Contractual Agreement and Misconstrues the Interplay of the Applicable Contractual Agreements.

USMS is "responsible for the safe and secure confinement, care and transportation of federal prisoners from the time of court-ordered custody until either their acquittal or their conviction and delivery to the Federal Bureau of Prisons to serve their sentence." *See* https://www.usmarshals.gov/what-we-do/prisoners. (*See also* Dkt. 14-3 at 3 ("The USMS ensures the secure custody, care, and safekeeping of USMS detainees.").) "Once ordered into custody by a U.S. District Court, [USMS] assumes responsibility for all prisoners charged with a federal offense, regardless of which state, local or federal law enforcement agency made the arrest." *Id*. USMS does not own or operate detention facilities of its own, but instead routinely enters into IGAs with state and local governments to provide detention space and services for USMS detainees in privately operated facilities, such as CCCC. *See* https://www.usmarshals.gov/what-we-do/prisoners/operation ("[USMS] houses over 63,000 prisoners in federal, state, local and private jails throughout the nation. … Seventy-five percent of the prisoners in [USMS] custody are detained in state, local and private facilities; the remainder are housed in Federal Bureau of Prisons (BOP)

facilities. [USMS] does not own or operate detention facilities but partners with state and local governments using intergovernmental agreements to house prisoners. Additionally, the agency houses prisoners in [BOP] facilities and private detention facilities.").

Under these so-called "pass-through" IGAs, the USMS enters into an IGA with a local government, such as Cibola County, which then enters into a contract with the owner of the privately operated detention facility, such as CoreCivic, to provide for the housing, care, and management of USMS detainees. Doing so allows the USMS to more quickly and efficiently enter into agreements to house its detainees by bypassing the competitive bidding process that would otherwise be required if USMS were to contract directly with private entities to operate detention facilities. However, USMS still retains operational oversight and control over the care and management of its detainees held in privately operated detention facilities, such as CCCC, by expressly including language in its "pass-through" IGAs mandating compliance with a comprehensive set of detention standards, requiring unfettered access to records pertaining to USMS detainees and to the USMS detainees themselves, dictating periodic inspections, and mandating regular reporting as well as reporting of specific incidents. (Dkt. 14-3 at 3, 5, 8–9, 12.) Additionally, the FPBDS dictate procedures for development of corrective action plans for non-compliance with the federal detention standards. (FPBDS § A.2.6.)

While Plaintiff claims that the Management Agreement (Dkt. 14-2) operationalizing the IGA between Cibola County and Immigration and Customs Enforcement ("ICE") does not cover the detention of USMS detainees at CCCC, this is incorrect. The Management Agreement, which was signed on October 28, 2016 (i.e., approximately one year before the USMS IGA was signed) expressly states that "the County may enter ***other/additional IGSAs*** for services to be provided at the Facility, subject to CCA's advance written approval." (Emphasis added.) (Dkt. 14-2 at 1, 6–7.) The Management Agreement further states "[f]or every federal inmate accepted into custody at the Facility, CCA shall provide services in compliance with the terms of the applicable IGSA,

which shall be appended to and incorporated into this Agreement." (*Id.*) Thus, the USMS IGA (Dkt. 14-3) is expressly incorporated into the Management Agreement, and CoreCivic has been performing under that IGA since shortly after it was entered into on October 19, 2017. Moreover, the USMS IGA was amended on October 19, 2017 (i.e., the date the IGA was signed) to state that "[t]he County and Marshal [sic] Service entered into a contract . . . whereby the County agreed to house the Marshal [sic] Service's Detainees, as a passthrough entity, with its contract with Core Civic [sic]" and "[t]he parties expressly agree and understand that overall management and operation of the housing of the Federal Detainees subject to this Agreement is contracted by the County to Core Civic [sic] under the County's agreement with Core Civic [sic]. The Marshal Service's [sic] hereby grants its consent to the contracting." (*Id.* at 15–16.)

Contrary to Plaintiff's assertions, the Complaint raises a claim against a federal contractor. In fact, both CoreCivic and the County are federal contractors by virtue of the USMS IGA amendment and the Management Agreement. Although Plaintiff is critical that "[t]here is not a single agreement between CoreCivic and the USMS for detention of individuals at the facility" (Dkt. 14 at 2), the IGA clearly evidences USMS's, the County's, and CoreCivic's intent from Day 1 of the IGA for CoreCivic to provide for the management and housing of USMS detainees at CCCC (Dkt. 14-3 at 16), and Plaintiff has not cited to any caselaw or other legal authority for the proposition that the federal officer removal statute is only applicable when there is a direct contract for the provision of services on behalf of the federal government.

Plaintiff attaches as Exhibit 1 to his Motion an Inmate Housing Agreement ("IHA") between Cibola County and CoreCivic under which CoreCivic agreed "to confine and supervise adult male and female inmates ***committed to or in the custody of the County***." (Dkt. 14-1 at 1–2.) (Emphasis added.) The IHA has no bearing on this case, as Plaintiff was not "committed to or in the custody of the County" at the time of the subject incident. Rather, he was in the custody of the USMS as a federal pretrial detainee. The IHA by its express terms pertains only to the County

inmate population housed at CCCC.[4] Thus, the provisions in the IHA providing for the County's right of inspection pertain only to the areas of the facility housing County inmates, and the right of access to records pertains only to records of County inmates—none of which include Plaintiff. (*Id.* at 2–3, 6.) Likewise, the provisions requiring pre-authorization by the County for non-emergency offsite medical care and establishing the County's obligation to pay for non-emergency offsite medical care pertain only to the County inmate population at CCCC; they do not apply to Plaintiff. (*Id.* at 12–13.)

Plaintiff also cites the IHA in his Complaint as the alleged basis for liability against the County. (Dkt. 1-1 at ¶¶ 11, 67–69.) Because the IHA does not apply to Plaintiff's detention at CCCC, undersigned counsel requested that Plaintiff amend his Complaint to remove all references and citations to the IHA and instead cite to the applicable contractual agreements. Plaintiff's counsel indicated that he would review the contractual agreements provided by Defendants and determine whether to amend Plaintiff's Complaint. However, he has not yet done so. Undersigned counsel also requested that Plaintiff dismiss the County from this lawsuit, which he declined to do. As a result, Defendants plan to move to dismiss the County once Plaintiff files his amended complaint.[5]

### C. Defendants Meet the Criteria for Removal Pursuant to Section 1442(a)(1).

#### 1. Defendants were acting under the direction of a federal officer.

To establish this element, a private person or corporation must show that their actions "involve[d] an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Suncor*, 25 F.4th at 1251 (citing *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 152 (2007)

[4] At the time of the subject incident on May 27, 2024, CCCC housed USMS, Immigration and Customs Enforcement ("ICE"), and County inmate populations.

[5] Plaintiff has indicated that he will amend his Complaint after the Court rules on his Motion and determines whether this case will proceed forward in federal or state court. (Dkt. 6.) Plaintiff agreed that Defendants may have until 30 days after the filing of his amended complaint to file their responsive pleading. (*Id.*)

(emphasis in original)). Mere compliance with a federal statute or regulation—even a detailed one—is not enough; there must be a "special relationship" between the private person or corporation and the federal superior. *Id*. (citing *Isaacson*, 517 F.3d at 137, and *Watson*, 551 U.S. at 157). To satisfy this element, the work carried out by a private actor "must help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, it must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract." *Suncor Energy*, 25 F.4th at 1253.

In *Bennett v. MIS Corp.*, 607 F.3d 1076, 1082, 1087–88 (6th Cir. 2010), the Sixth Circuit found that such a relationship existed between a private company hired to provide mold abatement services to the Federal Aviation Administration ("FAA"), which the Sixth Circuit noted was "a job that, in the absence of a contract with [the defendant] [or another private mold remediation firm] the [FAA] itself would have had to perform." *Id*. at 1088 (citing *Watson*, 551 U.S. at 154) (alterations added and in original.) The contract between the company and the FAA provided "detailed mold abatement specifications … and detailed [instructions] … pertaining to the materials that [the contractor] was required to use and the manner in which [the contractor] was to perform the [mold] remedial activities." *Id*. at 1087 (alterations added and in original). Additionally, "[f]ederal officers closely monitored [the contractor's] work," and the contract designated a federal officer to directly supervise the contractor's work. *Id*. The contract further gave the FAA contracting officers authority to require the contractor to dismiss those of its employees the FAA deemed "incompetent, insubordinate, unsuitable, or otherwise objectionable," and it prohibited any employees from entering the worksite without prior FAA approval. *Id*. On these and other facts, the Sixth Circuit found that the contractor met the "acting under" requirement of § 1442(a). *Id*.

By contrast, in *Watson*, the Supreme Court concluded that the Phillip Morris Companies were not "acting under" a federal officer or agency when testing and advertising the tar and

nicotine levels in their cigarettes in compliance with detailed regulations from the Federal Trade Commission. 551 U.S. at 146–47, 157. In so concluding, the Supreme Court reasoned that the "help or assistance necessary to bring a private person within the scope of the [federal officer removal] statute does *not* include simply *complying* with the law," but rather assisting federal officers "fulfill other basic governmental tasks" or "produce an item that the [federal government] needs." *Id.* at 152–53. The Supreme Court contrasted the alleged relationship between Phillip Morris and the FTC, in which Phillips Morris merely utilized testing regulations promulgated by the FTC, with that in *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998), *overruling on other grounds recognized by Latiolais v. Huntington Ingalls, Incorporated*, 951 F.3d 286, 291 (5th Cir. 2020), in which "Dow Chemical fulfilled the terms of a contractual agreement by providing the Government with a product [Agent Orange] that it used to help conduct a war" and "at least arguably, Dow performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153–54.

In *New Mexico ex rel. Balderas v. Monsanto Co.*, 454 F. Supp. 3d 1132, 1139 (D.N.M. 2020), the court determined that Monsanto was not "acting under" a federal officer with respect to the sale of PCB products to government contractors that incorporated them into products that were then sold by those contractors to the federal government. 454 F. Supp. 3d at 1140–1142. The court explained that "[t]he Government did not supervise Monsanto's manufacture of PCBs or direct Monsanto to produce PCBs in a particular manner so as to come within the meaning of 'acted under.'" *Id.* at 1140. The court distinguished the facts at hand from cases in which the Supreme Court has approved removal under the federal officer statute involving defendants "working hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Id.* at 1139 (citing *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 869–870 (E. D. Mo. 2016); *Ruppel v. CBS Corp.,* 701 F.3d 1176, 1181 (7th Cir. 2012)).

Here, CoreCivic assists USMS in carrying out its duty to provide for the "safe and secure

confinement" and "secure custody, care, and safekeeping of USMS detainees" by housing USMS detainees, such as Plaintiff, at CCCC pursuant to the USMS IGA and the Management Agreement, pursuant to which CoreCivic agreed to "provide services in compliance with the terms of the applicable [IGA]." (Dkt. 14-2 at 1, 13-3 at 3; https://www.usmarshals.gov/what-we-do/prisoners.)[6] The USMS IGA provides that it is intended to allow "[USMS] or other authorized agency user … to house Federal detainees with the Local Government at [CCCC]. The population … will include individuals charged with Federal offenses and detainees while awaiting trial, individuals who have been sentenced and are awaiting designation and transport to a Bureau of Prisons (BOP) facility, and individuals who are awaiting a hearing on their immigration status or deportation." (Dkt. 14-3 at 3.) At the time of signing, the IGA was amended to, among other things, state that "overall management and operation of the housing of the Federal Detainees subject to this Agreement is contracted by the County to Core Civic [sic] under the County's agreement with Core Civic [sic]. The Marshal Service's [sic] hereby grants its consent to the contracting." (*Id.* at 26.) The October 19, 2017 amendment also memorializes that "the County agreed to house the Marshal Service's [sic] Detainees, as a passthrough entity, with its contract with CoreCivic, Milan." (*Id.* at 25.)

The USMS IGA requires the Local Government (i.e., Cibola County and, pursuant to the Management Agreement, CoreCivic) to house federal detainees "in a manner that is consistent with Federal law and the Core Detention Standards and/or any other standards required by an authorized agency whose detainees are housed by the Local Government pursuant to this Agreement." (*Id.* at 3.)[7] The USMS IGA further requires the Local Government to provide medical

---

[6] "When a district court's subject matter jurisdiction is in question, it is empowered to review extra-complaint evidence and resolve factual disputes." *Bennett*, 607 F.3d at 1087 (reviewing the defendant's contracts with the FAA to determine applicability of removal pursuant to § 1442(a)).

[7] On September 27, 2019, the USMS IGA was amended to require compliance with the Federal Performance-Based Detention Standards ("FPBDS"). (Ex. 1: Modification of Intergovernmental Agreement, dated September 27, 2019.) The FPBDS provide detailed standards regarding all aspects of federal detention, including provision of healthcare. They can be found online at https://www.usmarshals.gov/sites/default/files/media/document/detention-standards.pdf.

care to detainees in accordance with the FPBDS and provides that "[a]t all times, the Federal Government shall have access to the Facility and to the Federal detainees housed there." (*Id.* at 3–5.) It also requires the Local Government to promptly notify the Federal Government of various events and sets the minimum rates at which the Local Government must pay its employees in performance of the contract. (*Id.* at 8.)

The "pass-through" IGA was entered into to allow a private contractor (CoreCivic) to assist the federal government with the performance of essential duties (detention and care of USMS detainees) to satisfy the federal government's pressing need for additional bed capacity beyond that available in existing federal detention facilities. The IGA contains contract terms requiring compliance with the FPBDS, which are derived from the American Correctional Association standards and were developed to establish the performance level required by the federal government for its detention contracts and aid subject matter experts in administering the federal government's quality assurance program through audits of non-federal detention facilities.[8] Pursuant to the "pass-through" IGA, CoreCivic carries out the detention of federal detainees on behalf of the federal government, thereby fulfilling the federal government's responsibility to provide for their safety and security. In short, CoreCivic acts on behalf of the USMS with respect to the detention of its federal detainees.

Thus, like the contractor in *Bennett*, CoreCivic meets the "acting under" element, as it assists with, or helps carry out, the performance of a federal task—namely, the provision of housing, sustenance, programming, and medical care to federal detainees housed at CCCC for the federal government while they await the completion of various stages of their federal criminal or immigration proceedings. In doing so, CoreCivic performs a fundamental governmental function which the federal government would otherwise have to perform itself. *See Suncor Energy*, 25 F.4th

[8] *See* https://www.usmarshals.gov/resources/guideline/federal-performance-based-detention-standards-version-12; FPBDS at ii, iii.

at 1253 (explaining that to satisfy the "acting under" prong, the work carried out by a private actor "must help federal officers fulfill basic government needs, accomplish key government tasks, or produce essential government products—that is, it must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract"). And in the performance of this function, CoreCivic and its employees are subject to detailed regulation through the FPBDS and regular monitoring and supervision by the USMS and other federal agencies (e.g., ICE) whose detainees are housed at CCCC pursuant to the IGA. *See Lind v. Northeast Ohio Corr. Center*, No. 4:21CV2165, 2022 WL 429453, at *1 (N.D. Ohio Jan. 27, 2022) (finding that CoreCivic satisfied the first element of § 1442(a) because "the relationship between [CoreCivic] and the Government is an unusually close one involving detailed regulation, monitoring, or supervision") (citing cases).[9]

Accordingly, CoreCivic satisfies the first element.

**1. The claims against Defendants have a connection or association with government-directed conduct.**

To establish this element, a private person or corporation must show "a nexus, a causal connection between the charged conduct and the asserted official authority. In other words, the removing party must show that it is being sued because of the acts it performed at the direction of the federal officer." *Bennett*, 607 F.3d at 1088 (cleaned up). "[T]he hurdle erected by this requirement is quite low." *Id.* (quoting *Isaacson*, 517 F.3d at 137); *see also Maryland v. Soper*, 270 U.S. 9, 33 (1926) ("It is enough that [the federal officer's] acts or his presence at the place in performance of his official duty constitute[s] the basis" for the lawsuit.).

Here, CoreCivic's performance of its official duty to house Plaintiff, his cellmate, and the two assailants on behalf of USMS constitutes the basis for this lawsuit. Plaintiff's Complaint

[9] Like CCCC, CoreCivic's Northeast Ohio Correctional Center ("NEOCC"), at issue in *Lind*, is subject to an Intergovernmental Pass-Through Agreement between USMS and Mahoning County and a Management Agreement between Mahoning County and CoreCivic.

alleges that CoreCivic failed to provide a qualified officer to supervise the detainees in Plaintiff's housing unit and "knew that one or both of the attackers should not have been housed in the same pod as Plaintiff and/or his cellmate."[10] (Dkt. 1-1 at ¶¶ 40–41, 64.) Thus, CoreCivic is being sued because of its hiring practices, classification and housing decisions, and disciplinary procedures, all of which are subject to the terms of the IGA and FPBDS. CoreCivic's and its employee's actions in providing for the care and safekeeping of Plaintiff and his cellmate were causally connected to the IGA and Management Agreement. That is, CoreCivic and its employees would not have been involved in these activities if not for the IGA and Management Agreement, such that their relationship with the federal government by virtue of these agreements constitutes the basis for the alleged acts and omissions with respect to the care and management of Plaintiff and his cellmate at CCCC. Accordingly, the claims against CoreCivic have the requisite connection with government-directed conduct, and CoreCivic has satisfied the second element.

**1. Defendants have a colorable federal defense to Plaintiff's claims.**

To establish this element, a private person or corporation must show a colorable federal defense. *Bennett*, 607 F.3d at 1089. Importantly, the defense need only be plausible, and the court "is not required to determine its validity at the time of removal." *Id*. "For example, in *Acker*, the Supreme Court concluded that the defendant had presented a colorable federal defense of inter-governmental tax immunity even though the Court ultimately rejected that defense." *Id*. (citing *Jefferson Cty., Ala. v. Acker*, 527 U.S. 423, 431 (1999)); *see also Lind*, 2022 WL 429453 at *2 ("The final prong presents a low bar and merely requires that the defendant's assertion is both defensive and based in federal law.") (quoting *In re Nat'l Prescription Opiate Litig.*, 327 F. Supp. 3d 1064, 1077 (N.D. Ohio 2018), and *Mesa v. California*, 489 U.S. 121, 129 (1989) (internal quotations removed)). This element is met where a defendant asserts that standards set by the

[10] All four involved USMS detainees were housed in a restrictive housing unit at CCCC, where detainees are segregated from the general population due to disciplinary offenses.

federal government were met. *Lind*, 2022 WL 429453 at *2 (citing *In re Welding Rod Prod. Liab. Litig.*, No. 1:03-CV-17000, 2004 WL 1179454, at *12 (N.D. Ohio May 21, 2004) and *Little v. Purdue Pharma, L.P.*, 227 F. Supp. 2d 838, 861 (S.D. Ohio 2002)) ("a colorable federal defense is raised when a defendant is 'operating under the terms of a federal contract, and thus the operative contractual commands of federal officials'").

Here, CoreCivic has not yet submitted an Answer or Affirmative Defenses to Plaintiff's Complaint.[11] However, CoreCivic intends to raise a defense that it was operating under the terms of the USMS IGA with respect to the detention of Plaintiff, his cellmate, and the two assailants (and was thus bound by the contractual commands of USMS) and was acting in accordance with applicable correctional standards, including the FPBDS, with respect to the qualifications of the detention officer, the classification and housing assignments of the four involved USMS detainees, the disciplinary procedures employed, and the management of the restrictive housing unit where the four involved USMS detainees were housed. Although the IGA and the FPBDS do not establish the standard of care applicable to Plaintiff's negligence claim against CoreCivic, they are relevant to the question of CoreCivic's compliance with it. *See Therrien v. Target Corp.*, 617 F.3d 1242, 1256 (10th Cir. 2010) ("Although a company's internal policies do not alter the applicable standard of care, they are admissible to show negligence, even if the policies demand a higher standard of care than the applicable law. We have permitted admission of such policies when the jury is instructed that they are not admitted as legal standards of duty, but as evidence of the measure of caution which ought to be exercised in situations to which the rules apply.") (internal citations and quotations omitted).

---

[11] As explained in the Notice of Agreed Extension of Time for Defendants' Response to Plaintiff's Complaint (Dkt. 6), counsel for Plaintiff informed undersigned counsel that Plaintiff intends to serve an Amended Complaint, but he prefers to file his Amended Complaint after the Court determines whether this matter will proceed in federal court or be remanded to state court. Accordingly, the parties have agreed that the deadline for Defendants to file their responsive pleading will be 30 days after Plaintiff files an Amended Complaint.

The Court need not decide now whether that position is correct; it is enough that the position is based on CoreCivic's association with the federal government, which, as demonstrated above, meets the requirement that they be "acting under" the federal government. *See Lind*, 2022 WL 429453, at *2 (finding that CoreCivic's defense to the plaintiff's allegations of failure to provide proper medical care "is that the medical care standards, set by the federal government, were indeed met" was sufficient to establish the third element).

As a result, CoreCivic satisfies the third element.

## III. Conclusion

For the foregoing reasons, Defendants request that the Court deny Plaintiff's Motion.

Dated: August 6, 2025

*/s/ Anne M. Orcutt*

Daniel P. Struck, AZ Bar No. 012377
Jacob B. Lee, NM Bar No. 154613
Anne M. Orcutt, AZ Bar No. 029387
STRUCK LOVE ACEDO, PLC
3100 West Ray Road, Suite 300
Chandler, AZ 85226
Tel.: (480) 420-1600
Fax: (480) 420-1695
dstruck@strucklove.com
jlee@strucklove.com
aorcutt@strucklove.com

Deborah D. Wells
Debra J. Moulton
KENNEDY, MOULTON & WELLS, P.C.
2201 San Pedro N.E., Bldg. 3, Suite 200
Albuquerque, NM 87110
Tel.: (505) 844-7887
Fax: (505) 844-7123
ddwells@kmwpc.com
dmoulton@kmwpc.com

*Attorneys for Defendants CoreCivic, Inc, CoreCivic, LLC, and CoreCivic of Tennessee, LLC, and Board of County Commissioners for Cibola County*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 6, 2025, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Jason Wallace
HUFFMAN WALLACE & MONAGLE, LLC
122 Wellesley Dr. SE
Albuquerque, NM 87106
Tel: 505-255-6300
jason@hwm.law

*Attorney for Plaintiff*

*/s/ Kim Penny*