IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

DANIEL E. LUJAN,

      Plaintiff,

v.                                           No. 1:25-cv-00527-SMD-JFR

BOARD OF COUNTY COMMISSIONERS
FOR CIBOLA COUNTY, CORECIVIC, INC.,
CORECIVIC, LLC, AND CORECIVIC OF
TENNESSEE, LLC,

      Defendants.

## ORDER ON MOTION TO REMAND

THIS MATTER is before the Court on Plaintiff's Motion to Remand (Doc. 11).  The Court

has reviewed the parties' submissions, the record, and the relevant law, and for the reasons below,

the motion is granted.

### BACKGROUND

On May 1, 2025, Plaintiff Daniel Lujan filed a complaint in the 13th Judicial District Court,

Cibola County, against Defendants Board of County Commissioners for Cibola County ("Cibola

County"), CoreCivic, Inc., CoreCivic, LLC, and CoreCivic of Tennessee, LLC ("CoreCivic"),

alleging violations of the New Mexico Tort Claims Act and the New Mexico Civil Rights Act.

Doc. 1-1.  Plaintiff was detained at Cibola County Corrections Center ("CCCC") as pursuant to a

contract between Cibola County and the U.S. Marshals Service ("USMS").  Doc. 1-1 ¶ 15.  CCCC

is a detention facility that is owned and operated by CoreCivic.  *Id.* ¶ 9.  Plaintiff and his cellmate,

Julian Montoya, were housed in a cell within a pod where the inhabitants of each cell were

restricted from physical contact with the inhabitants of other cells.  *Id.* ¶ 37.  On May 27, 2024, a

corrections officer left the door to another cell within the pod unlocked, the inhabitants of the unlocked cell escaped, and after subduing the corrections officer, the two inmates attacked Plaintiff and Montoya. *Id.* ¶¶ 39–52. Plaintiff alleges that the corrections officer was unqualified to work in the pod where Plaintiff was housed, that CoreCivic was negligent in failing to stop the attack, that Cibola County was negligent in its operation of CCCC, and that Cibola County's failures to protect Plaintiff resulted in a deprivation of his state constitutional rights in violation of the New Mexico Civil Rights Act. *Id.* ¶¶ 79–105.

Counsel for CoreCivic accepted service on May 5, 2025. Doc. 1 at 1. Cibola County was served by certified mail on May 7, 2025. *Id.* On June 4, 2025, Defendants filed a notice of removal, invoking this Court's jurisdiction under 28 U.S.C. § 1442(a)(1). *Id.* Defendants then moved to consolidate this action with the separate lawsuit filed by Plaintiff's cellmate against Cibola County and CoreCivic in the 13th Judicial District Court, which was also removed to federal court on June 4, 2025. *See* Doc. 11. On July 22, 2025, Plaintiff moved to remand. Doc. 14.

**LEGAL STANDARD**

Under the federal officer removal statute, a defendant in a state court action can remove the matter to federal district court if the cause of action arises out of actions taken at the direction of the federal government. The statute provides:

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

2

28 U.S.C. § 1442(a)(1). The parties removing to federal court bear the burden of establishing federal jurisdiction by a preponderance of evidence. *Dutcher v. Matheson*, 733 F.3d 980, 985 (10th Cir. 2013).

## DISCUSSION

Defendants assert that CoreCivic provided detention services, housing, and care to USMS detainees at CCCC pursuant to an intergovernmental services agreement ("IGSA"). Doc. 1. USMS enters into intergovernmental agreements with state and local governments to provide detention space and services for USMS detainees in privately operated facilities like CCCC, and the state or local government enters into a contract with the owner of the privately operated facility. Doc. 1 at 3–4. In this case, Cibola County contracts with CoreCivic to provide detention services for detainees placed at CCCC pursuant to an agreement between USMS and Cibola County. *Id.* at 4. Defendants argue that under these arrangements, the state or local government serves as a "pass-through" entity, and the owner of the privately operated facility carries out the detention of federal detainees on behalf of the federal government. *Id.*

The parties appear to agree that as of May 27, 2024, three contracts set forth the duties and obligations of CoreCivic and Cibola County with respect to detainees at CCCC:

(1) In October 2016, Cibola County entered an IGSA with U.S. Immigration and Customs Enforcement ("ICE") to provide detention services at CCCC ("2016 ICE Agreement"). Doc. 14 at 3. Also in October 2016, Cibola County entered into an agreement with CoreCivic, previously Corrections Corporation of America ("2016 Management Agreement"). Doc. 14-2. The 2016 Management Agreement provides that Cibola County "shall enter into the IGSA with ICE" and place federal inmates at CCCC as directed by ICE. *Id.* at 1. The 2016 Management Agreement further provides that

Cibola County "may enter into other/additional IGSAs for services to be provided at [CCCC]," subject to CoreCivic's advance written approval. *Id.* For federal detainees placed at CCCC, CoreCivic "shall provide services in compliance with the terms of the applicable IGSA." *Id.*

(2) In October 2017, Cibola County entered into an IGSA with USMS to house federal detainees at CCCC ("2017 USMS Agreement"). *See* Doc. 14-3. Under the 2017 USMS Agreement, Cibola County agreed to provide for the secure custody and care of federal detainees in accordance with state and local laws and in a manner consistent with federal law. *Id.* at 3. Cibola County and USMS also executed a same-day amendment, agreeing that the housing of federal detainees at CCCC under the 2017 USMS Agreement would be contracted out under Cibola County's agreement with CoreCivic. *Id.* at 15. In 2019, Cibola County and USMS executed another amendment, replacing references to Core Detention Standards with Federal Performance Based Detention Standards. *See* Doc. 18-1.

(3) In July 2021, Cibola County and CoreCivic entered into an Inmate Housing Agreement ("2021 Housing Agreement"), under which CoreCivic would provide housing for Cibola County inmates. *See* Doc. 14-1. The parties agree that the 2021 Housing Agreement only applies to detention of County inmates. *See* Doc. 14 at 3; Doc. 14-4.

Plaintiff argues that CoreCivic was not acting under the direction of a federal officer or under color of a federal agency with respect to Plaintiff, a USMS detainee, because none of the contracts are between CoreCivic and USMS. Doc. 14 at 3–4. The 2021 Housing Agreement only concerns Cibola County inmates; the 2016 ICE Agreement only concerns ICE detainees; and CoreCivic is not a party to the 2017 USMS Agreement or the same-day amendment. *See id.* at 3.

4

Defendants respond that removal under § 1442(a)(1) does not require a direct contractual relationship, and that CoreCivic is subject to regular monitoring and supervision by USMS. Doc. 18 at 3–4, 12.  Defendants also dispute that the 2016 Management Agreement does not cover the detention of USMS detainees at CCCC, pointing to language that allows Cibola County to "enter other/additional IGSAs for services to be provided at the Facility," and provides that CoreCivic will "provide services in compliance with the terms of the applicable IGSA, which shall be appended to and incorporated into this Agreement."  *Id.* at 5–6; Doc. 14-2 at 1.  Defendants contend that CoreCivic and Cibola County are federal contractors by virtue of the 2016 Management Agreement and the amendment to the 2017 USMS Agreement providing that Cibola County would contract out the housing of federal detainees at CCCC to CoreCivic.  Doc. 18 at 6.

Private defendants may remove under § 1442(a)(1) if they can show (1) they acted under the direction of a federal officer, (2) the claim has a connection or association with government-directed conduct, and (3) they have a colorable federal defense to the claim or claims.  *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1251 (10th Cir. 2022). Here, Plaintiff only disputes Defendants' ability to meet the first element.  *See* Doc. 22 at 1.

As the Tenth Circuit observed in *Suncor*, the words "acting under" are broad but "not limitless."  25 F.4th at 1251 (citing *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007)).  To meet the "acting under" element, the private entity "must go beyond mere compliance with contractual terms, even if complex, and agree to help carry out the duties or tasks of the federal superior under that superior's strict guidance or control."  *Id.* at 1253.  This closely supervised work "must stand in for critical efforts the federal superior would need to undertake itself in the absence of a private contract."  *Id.*  The "acted under" element also may be established through the explicit contractual delegation of legal authority to act on the federal superior's behalf.  *Id.*

5

In *Suncor*, the Tenth Circuit examined the contractual relationship between the Department of Interior and Exxon entities that leased portions of the outer continental shelf of the United States ("OCS") pursuant to the Outer Continental Shelf Lands Act ("OCSLA") to extract fossil fuels. *Id.* at 1247. Exxon and other defendant energy companies argued that federal jurisdiction existed under § 1442(a) because the OCS leases required Exxon to conduct drilling "in accordance with" federally approved exploration, development, and production plans and conditions. *Id.* Exxon was required to "exercise diligence in the development of the leased area and in the production of wells located thereon"; "prevent unnecessary damage to, loss of, or waste of leased resources"; and "comply with all applicable laws, regulations and orders related to diligence, sound conservation practices and prevention of waste." *Id.* at 1247–48. Exxon was also required to provide DOI officials with "prompt access" to facilities and records for the purpose of federal safety, health, or environmental inspections. *Id.* at 1248.

The Court compared the "intense regulation" of a private firm *not* operating under a governmental contract in *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142 (2007), to the "close supervision" of a government contractor in *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387 (5th Cir. 1998), *overruled on other grounds by Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020). In *Watson*, the Supreme Court considered whether the Philip Morris Companies were "acting under" a federal officer or agency when testing and advertising cigarettes in compliance with the Federal Trade Commission's detailed regulations. 551 U.S. at 136. The Court rejected the defendants' removal efforts, holding that Phillip Morris was simply conducting its operations in compliance with federal law "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored." *Id.* at 153. The Court noted the FTC's "detailed rules about advertising, specifications for testing, requirements about reporting

results, and the like," but found that despite "considerable regulatory detail and supervision," this did not amount to delegation. *Id.* at 157.

In contrast, the Fifth Circuit found "a sufficient special relationship" between the government and manufacturers of Agent Orange under a Department of Defense contract. *Winters,* 149 F.3d at 398. The Fifth Circuit determined that the manufacturers had a "special relationship" with the government whereby a manufacturer helped carry out the duties or tasks of the federal superior, performing a job that "at least arguably . . . the government itself would have had to perform." *Suncor*, 25 F.4th at 1252 (quoting *Watson*, 511 U.S. at 152, 154). Although the manufacturers had produced a commercial version of the mixture prior to government involvement, the contracts included specifications concerning the formulation, packaging, and delivery of Agent Orange. *Winters*, 149 F.3d at 399. The DOD also conducted supervisory reviews to determine the manufacturers' compliance with the contractual requirements. *Id.* at 400–01.

Turning to the OCS leases between the Exxon entities and the DOI, the Tenth Circuit concluded that Exxon's contractual relationship with the DOI did not meet the "acting under" element. *Suncor*, 25 F.4th at 1253. The OCS leases did not obligate Exxon to perform services for the government, and Exxon was not assisting the government with essential duties or tasks. *Id.* Nor did the OCS leases contemplate the type of "close supervision of the private entity by the government" needed to bring a government contractor relationship within the meaning of § 1442. *Id.* While the OCS leases required compliance with OCSLA's regulatory requirements, they did not control the manner in which Exxon drilled or produced the product. *Id.* Lastly, the *Suncor* Court concluded that none of the OCS leases established the type of formal delegation that might authorize the defendants to remove the case. *Id.* at 1254.

In this case, Plaintiff acknowledges that "USMS has a basic need—to store people—that the operation at CCCC certainly appears to fulfill." Doc. 22 at 1. However, the record does not reflect the requisite level of federal supervision over CoreCivic. The contracts—which the parties do not dispute—identify the following with respect to federal supervision and compliance with federal regulations at CCCC:[1]

(1) Pursuant to the 2016 Management Agreement, "[t]he Contractor agrees to abide by all federal, state and county laws and rules and regulations, pertaining to equal employment opportunity." Doc. 14-2 at 3. The 2016 Management Agreement also incorporates the terms of the 2016 ICE Agreement, and provides that CoreCivic will provide services in compliance with the terms of the 2016 ICE Agreement. *Id.* at 1.

(2) The 2017 USMS Agreement requires that USMS detainees are housed "in a manner that is consistent with Federal law and the Core Detention Standards and/or any other standards required by an authorized agency whose detainees are housed by [Cibola County]," and provides that the USMS "shall have access to [CCCC] and the Federal detainees housed there, and to all records pertaining to this agreement . . . for a period going back three (3) years from the date of the request." Doc. 14-3 at 3. The 2019 amendment updates the Core Detention Standards with Federal Performance Based Detention Standards. Doc. 18-1 at 2.

---

[1] The 2017 USMS Agreement references an existing contract between Cibola County and CoreCivic as of October 2017. Whether that refers to the 2016 Management Agreement, an earlier version of the 2021 Housing Agreement, or a different agreement between Cibola County and CoreCivic is unclear. Neither Plaintiff nor Defendants pointed to any amendment to the 2016 Management Agreement appending and incorporating the terms of the 2017 USMS Agreement, or any separate agreement between Cibola County and CoreCivic for housing of federal detainees. Rather, Defendants argue that the terms of the 2017 USMS Agreement are expressly incorporated into the earlier 2016 Management Agreement based on language in the 2016 Management Agreement that contemplates future agreements with other federal entities, and provides that for federal detainees at CCCC, CoreCivic shall provide services in accordance with the applicable IGSA.

(3) Pursuant to the 2021 Housing Agreement for housing County inmates, "[CoreCivic] shall, at all times during the performance of its obligations of this Agreement with all applicable federal, state and local laws and regulations." Doc. 14-1 at 16. CoreCivic also "agrees to comply with applicable federal and state laws, codes, statutes, regulations, constitutional requirements, court orders, American Correctional Association (ACA) standards and the National Standards to Prevent, Detect and Respond to Prison Rape under the Prison Rape Elimination Act (PREA) in the housing of County inmates to ensure that the facility is safe, humane, and protects the statutory and constitutional rights of County inmates." *Id.* at 17.

Without reaching the question of whether a direct contractual relationship is required to meet the "acting under" element, the Court finds that none of these requirements rises to the requisite level of federal supervision outlined in *Suncor*. Defendants cite *Lind v. Ne. Ohio Corr. Ctr.*, No. 4:21-cv-2165, 2022 WL 429453 (Jan. 27, 2022 N.D. Ohio), as an example of CoreCivic entities successfully removing to federal court under § 1442(a). Defendants argue that like CCCC, CoreCivic's Northeast Ohio Correctional Center ("NEOCC") "is subject to an Intergovernmental Pass-Through Agreement between USMS and Mahoning County and a Management Agreement between Mahoning County and CoreCivic." Doc. 18 at 12. However, the NEOCC contract in effect during the time period relevant in *Lind* was a different contract between USMS and *CoreCivic*. *See* Doc. 22 at 3–4. Not only was the NEOCC contract a direct contract between CoreCivic and USMS, the contract award set forth much more detailed terms than the 2017 USMS Agreement with Cibola County. *See* Doc. 22-1.

As Plaintiff points out, the reporting and notification obligations in the NEOCC contract are significantly broader than the obligations outlined in the 2017 USMS Agreement or the

9

subsequent amendments. *See* Doc. 22 at 7; Doc. 22-1 at 14, 16–17, 24. The NEOCC contract also outlines detailed inspection and audit requirements. *See* Doc. 22 at 7–8; Doc. 22-1 at 47 –53. The NEOCC contract further provides that the USMS may withhold payments, mandate corrective action plans, suspend detainee transfers, or immediately terminate the contract for breaches of these requirements. *See* Doc. 22 at 7; Doc. 22-1 at 14, 47–48.

Even if, as Defendants contend, the same-day amendment converted the 2017 USMS Agreement into a contract between USMS and CoreCivic, the terms of the 2017 USMS Agreement do not meet the requisite special relationship discussed in *Suncor* or the level of federal oversight outlined in the NEOCC contract in *Lind*. The Court finds that Defendants have failed to establish by a preponderance of the evidence that CoreCivic was "acting under" the USMS as required for federal officer removal.

Accordingly, Plaintiff's Motion to Remand (Doc. 14) is GRANTED. Defendants' Motion to Consolidate (Doc. 11) is denied as moot. This case is REMANDED to the 13th Judicial District Court, Cibola County.

IT IS SO ORDERED.

_____
**SARAH M. DAVENPORT**
**UNITED STATES DISTRICT JUDGE**

10